**Bruce E. LEE, Appellee**

v.

**Kristin J. LEE, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 20, 2008.
Filed July 15, 2009.

Darren J. Holst, Harrisburg, for appellant.

Jason J. Schibinger, Lebanon, for appellee.

BEFORE: GANTMAN, SHOGAN and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, Kristin J. Lee (Wife), appeals from the equitable distribution decree entered in the Lebanon County Court of Common Pleas. In this case we find, *inter alia*, that in divorce-related equitable distribution, when a spouse has been excluded from the marital home by a protection from abuse order, the other spouse

may raise an equitable defense against the first spouse's claim to rental credit for the time period in which the order was in effect. We affirm the decree in part, reverse in part, and remand for proceedings consistent with this memorandum.

¶ 2 Wife and Appellee, Bruce E. Lee (Husband) were married in 2000. Wife was thirty-five years old at the time, and Husband was forty-seven; it was the second marriage for both. In May of 2001, their son was born. The parties lived in the house that had been Wife's home before the marriage; she had purchased it in 1999 with $70,000 of her savings. In 2001, the parties refinanced the home and Husband's name was added to the deed. Wife then sold two other pre-marital real estate parcels and applied the proceeds toward improving the marital home and paying off the refinanced mortgage.

¶ 3 In January of 2005, the parties separated; Husband left the marital residence and Wife took primary physical custody of their son, continuing to live in the marital home. At that time, Husband was fifty-two years old and Wife was forty. In July of that year, Husband attempted to gain entry to the home and take the child. As a result, on August 18th Wife secured a protection from abuse order (PFA) which banned Husband from the home.

¶ 4 In February of 2005, Wife commenced a divorce but discontinued it one year later. On February 16, 2006, Husband filed a divorce complaint. A special master was appointed, who held an equitable distribution hearing on October 11, 2006. The special master issued his report in June of 2007; both parties filed exceptions, and on October 18, 2007 the trial court entered a divorce decree and an order granting the exceptions in part and denying them in part. The court upheld the master's recommended award of 65% of the marital property to Wife and 35% to Husband. It agreed with the master that Wife had a donative intent when she deeded the marital home in both parties' names, and thus that her premarital residence became marital property. Despite the PFA, the court also granted Husband rental credit for the twenty-five month period that began when the parties separated.

¶ 5 Wife appeals, presenting three issues for our review: whether the trial court abused its discretion in: (1) fashioning equitable distribution, when it failed to consider the duration of the marriage, the economic disparity between the parties, and her contributions to the marital estate; (2) awarding Husband a twenty-five month rental credit; and (3) compelling her to liquidate the home to effectuate the court's distribution arrangements.[1]

¶ 6 In reviewing equitable distribution orders,

[our standard] of review ... is limited. It is well established that absent an abuse of discretion on the part of the trial court, we will not reverse an award of equitable distribution. [In addition,] when reviewing the record of the proceedings, we are guided by the fact that trial courts have broad equitable powers to effectuate [economic] justice and we will find an abuse of discretion only if the trial court misapplied the laws or failed to follow proper legal procedures. [Further,] the finder of fact is free to believe all, part, or none of the evidence and the Superior Court will not disturb the credibility determinations of the court below.

---

1. Although issues (1) and (3) were combined, we separate and reorder them for ease of discussion.

*Anzalone v. Anzalone,* 835 A.2d 773, 780 (Pa.Super.2003) (citation omitted). In addition,

> We do not evaluate the propriety of the distribution order upon our agreement with the court['s] actions nor do we find a basis for reversal in the court's application of a single factor. Rather, we look at the distribution as a whole, in light of the court's overall application of the [23 Pa.C.S.A. § 3502(a) ] factors [for consideration in awarding equitable distribution]. If we fail to find an abuse of discretion, the [o]rder must stand.

*Trembach v. Trembach,* 419 Pa.Super. 80, 615 A.2d 33, 36 (1992) (citation and footnote omitted).

■ ¶ 7 In her first issue, Wife avers that the trial court abused its discretion in awarding her only 65% of the marital estate by failing to consider her "significant" contributions to the marital estate, which included her premarital residence that became jointly titled "only . . . as a result of a mortgage refinancing Husband advocated," and not because of any monetary contribution from him. (Wife's Brief, at 24). Wife maintains she invested money, earned from the sale of two additional premarital properties in the home: $30,000 to make improvements and more than $80,000 to fulfill the mortgage obligation. She also contends the court ignored the short duration—five years—of the marriage, and the fact that it was the second marriage for both parties. In addition, Wife argues that post-separation, there was a "severe economic disparity" between the parties, as Husband enjoyed a financial position much superior to hers, while her financial situation had not returned to what it had been prior to the marriage. (*Id.* at 25, 615 A.2d 33). Wife concludes that the court failed to consider the "vanishing credit theory," which provides that where a marriage has not been of long duration, credit should be given to the parties for definable, premarital assets. Wife urges that she should be granted 100% of the marital home, an award that has been upheld in other cases by this Court.

¶ 8 Under section 3502(a) of the Divorce Code, the court "shall equitably divide, distribute or assign, in kind or otherwise, the marital property between the parties without regard to marital misconduct in such percentages and in such manner as the court deems just after considering all relevant factors." *Id.* (citation omitted). Section 3502(a) sets forth factors to be considered in fashioning an equitable distribution award:

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

\* \* \*

(6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

\* \* \*

(10) The economic circumstances of each party at the time the division of property is to become effective.

23 Pa.C.S.A. § 3502(a)(1)-(3), (6)-(7), (10). "[T]he trial court has the authority to divide the award as the equities presented in the particular case may require." *Anzalone, supra* at 785 (citation and quotation marks omitted).

¶ 9 The special master, in recommending that Wife be awarded 65% of the marital property and Husband 35%, noted the dates of the parties' marriage and separation, the fact that it was the second marriage for both parties, their ages, and their "good health." (Special Master's Report, at 15). The master stated that at the time of separation, Wife was working part time, cared for the parties' child, but did not receive health insurance, and that Husband was employed full-time as an insurance agent, but in 2005 was living off his non-marital pension account. These findings were proper under section 3502(a).

¶ 10 We note that the master found Wife's testimony that she was coerced or otherwise misled into refinancing the home, resulting in the addition of Husband's name to the deed, to be "less than credible." (*Id.* at 21). Thus, the master concluded that at the time of the refinancing, the home "converted from a premarital asset to a marital asset thereby giving ... Husband a valid claim to the full value of the property." (*Id.*). In considering sub-section 3502(a)(7), the contribution of each party to the acquisition, preservation, or appreciation of marital property, the master found: "Wife was the primary means of support during the marriage until Husband began working at New World Pasta. Beyond that, both parties contributed equally to this factor." (*Id.* at 25). However, elsewhere in his report, the Master noted that "Wife purchased the marital residence prior to the parties['] marrying." [2] (*Id.* at 9).

¶ 11 In addition, the court specifically noted that the home was purchased by Wife with $70,000 of her savings. (Trial Ct. Op., at 2). Wife testified that she purchased the home in March 1999 with a $100,000 mortgage, and that by the time they were married in May 2000, she had paid down the mortgage to about $90,000. (N.T. 10/11/06, at 174). When she refinanced the mortgage in September 2001, she paid down an additional $23,000, using funds from the sale her two pre-marital properties.[3] (*Id.* at 179–80). In December 2002, Wife paid the balance of the mortgage in full with the same funds. (*Id.* at 188).[4] Meanwhile, Husband testified that he contributed "nothing significant," aside from some furniture, to the marital estate. (*Id.* at 64).

¶ 12 These figures were not in dispute. Accordingly, we find the record does not support the court's adoption of the master's finding with respect to subsection 3502(a)(7). Instead, we agree with Wife that her premarital funds were used to purchase and improve a significant portion of the marital home. We find significant the fact that the marital home was purchased before the marriage solely with Wife's savings, and that the mortgage was repaid in full two years and four months into the marriage, or within its first half, mainly from Wife's premarital funds. In addition, none of Husband's premarital retirement fund, valued at about $500,000 and which did not appreciate during the marriage, was subject to equitable distribution. Finally, we note Husband's testi-

2. The home was valued at $195,000 at the time of the marriage. The master set the fair market value at the time of separation at $286,500, finding that both Wife's appraisal of $273,000 and Husband's appraisal of $300,000 were fair and reasonable. (Special Master's Report, at 9–10).

3. One property, in Downingtown, was sold in July 2001 for $59,496.81, and the other property, in Chester Springs, was sold in September 2001 for $71,450.31. (N.T. 10/11/06, at 181–83).

4. In addition, Wife testified that she used $17,390 of the funds to pay off the loans on Husband's car and her car. (*Id.* at 186, 188).

mony that it was Wife who primarily handled the household finances, stating, "[The money to pay the bills] would have gone out of her-she would pay all the bills." (*Id.* at 80–81). Accordingly, in light of our discussion, we remand to the trial court to determine the percentage of the value of the marital home attributable to Wife's premarital interest, funds from the sale of other premarital assets so used, and to joint marital assets, and to distribute the value of the home accordingly.

¶ 13 We also address the 65/35 allocation awarded by the court. The master found that Husband has a "substantial" retirement account, valued at almost $500,000, that fell outside the marital estate, and that Wife did "not have access to such a potential income stream." (*Id.* at 25). Accordingly, the master declined to recommend an equal division, as it "would unduly penalize" Wife, "give[n] the modest size of the marital estate." (*Id.*). We note that this recommendation was based on factors other than those issues surrounding the distribution of the marital home.

¶ 14 The trial court adopted the master's recommendation to divide the property 65% to 35%. (*See* Trial Ct. Op., at 6). The court considered Wife's arguments that she was their child's primary custodian, that she contributed significant assets to the marital estate, and that Husband reduced his income during the marriage and "brought little to the marriage." (*See id.* at 5–6). The court also considered Husband's argument for an equal, 50–50 division of the property because Wife is twelve years younger than he and thus has more time to save for retirement. If the court finds, after fashioning a new distribution scheme for the marital home and reviewing the marital estate as a whole, that reconsideration or reexamination of the overall 65–35 distribution is necessary, it may conduct such an inquiry.

¶ 15 In her second issue, Wife challenges the court's award of twenty-five months' fair market rental credit to Husband. Because she raises several contentions in support of this claim, we review the relevant legal considerations and address her arguments *seriatim.* We first note that

> it is within the discretion of the trial court to grant rental value as a part of equitable distribution. The award of rental value is within the sound discretion of the trial court. The basis of the award of rental value is that the party out of possession of jointly owned property (generally the party that has moved out of the formal marital residence) is entitled to compensation for her/his interest in the property.

*Trembach, supra* at 37 (citations omitted). Generally, "parties have an equal one-half interest in the marital property," and thus "the dispossessed party will be entitled to a credit for one-half of the fair rental value of the marital home." *Id.* This Court has discussed the analysis for deciding whether to award rental credit:

> First, the general rule is that the dispossessed party is entitled to a credit for the fair rental value of jointly held marital property against a party in possession of that property, provided there are no equitable defenses to the credit. Second, the rental credit is based upon, and therefore limited by, the extent of the dispossessed party's interest in the property.... Third, the rental value is limited to the period of time during which a party is dispossessed and the other party is in actual or constructive possession of the property. Fourth, the party in possession is entitled to a credit against the rental value for payments made to maintain the property on behalf of the dispossessed spouse. Generally, in regard to the former marital resi-

dence, payments made on behalf of the dispossessed spouse will be one-half of the expenses including debt service on the property. This is so because equity places a presumption upon the dispossessed spouse of responsibility for expenses to the extent of her/his ownership interest which is generally one-half. Finally, we note that whether the rental credit is due and the amount thereof is within the sound discretion of the court of common pleas.

*Id.* (citations omitted).

¶ 16 First, Wife argues that the court's finding that she had urged Husband to vacate the home is not supported by the record, as he acknowledged having contemplated separation two months earlier. She further alleges that "[o]n January 8, 2005, the parties had an argument, which culminated in Husband voluntarily vacating the marital residence." (Wife's Brief, at 8). Wife also points out that the court expressly found that Husband voluntarily left the home when it rejected his defense that Wife was not entitled to spousal support.

¶ 17 Here, the trial court reviewed the record and affirmed the special master's "implied determination that Wife pressed Husband to separate and vacate the marital home in January of 2005." (Trial Ct. Op., at 8). At the special master's hearing on October 11, 2006, when asked why he and Wife separated, Husband replied that Wife "had a series of changes that she wanted [him] to make in [his] life," and "imposed a deadline" that if he did not make the changes by the end of the year, they would separate.[5] (N.T. Special Master's Hearing, 10/11/06, at 93–94). He stated that he received an e-mail message from her after Christmas of 2004 asking him to leave, and explained:

When I initially left that weekend, it was in my opinion, I thought I was leaving for the weekend. We were involved in some discussions, and it was getting heated, so I left after that point. So my initial intention was not to leave at that point, but I knew we were on the road to separation. I believed we were going to be doing that over the course of January, early February, but it got pushed very fast by her.

(*Id.* at 94). Wife, on the other hand, testified that on January 8th, they talked about the logistics of separating, and in the evening had an argument. According to Wife, Husband stated, "I think it is best if I leave now," to which she replied, "[T]hat is fine with me." (*Id.* at 154).

¶ 18 Reviewing Wife's arguments for relief against the transcript, we see that Wife is requesting this Court to re-evaluate the testimony and favor her account of events surrounding the separation. This we decline to do, as this Court cannot disturb the credibility determinations of the trial court. *See Anzalone, supra.* Instead, we conclude that the record supports the trial court's finding that Wife participated in Husband's decision to leave, and thus, that the court did not abuse its discretion. *See id.*

¶ 19 As to the extent and amount of the rental credit awarded, Wife argues that the court erred in finding there was no equitable defense to Husband's receiving rental credit for the time the PFA was in effect. She avers the court improperly found Husband was a "dispossessed" spouse when it was his own abusive behavior that led to his legal exclusion from the

---

5. Husband also stated that he was unhappy with his inability to blend his current family with his adult children and grandchildren from his first marriage. (N.T. Hearing, 10/11/06, at 93).

home. She maintains that the PFA was entered as a result of Husband's unannounced arrival at the marital home in July of 2005 and his demand that she relinquish custody of their son. When Wife refused, Husband forcibly gained entry into the home by grabbing and shoving her, compelling her to lock herself and the child in an upstairs bedroom. Wife maintains that Husband was provided a hearing on these claims, and that the court, in granting the PFA, ruled she was more credible. Wife adds that even if Husband were due rental credit as of the time of separation, he should not be entitled to any rental credit as of the entry of the PFA. In making these arguments, Wife stresses that equity precludes a party from benefiting from wrongdoing.[6]

 ¶ 20 As Wife notes, there is no legal authority[7] on point on the question of whether a PFA, or a spouse's abusive behavior prompting a PFA, can be the basis of a meritorious equitable defense to an award of rental credit. However, the Divorce Code provides that its purpose is to "[e]ffectuate economic justice between parties who are divorced or separated . . . and insure a fair and just determination and settlement of their property rights." 23 Pa.C.S.A. § 3102(a)(6). Section 3323(f) provides:

> In all matrimonial causes, the court shall have full equity power and jurisdiction and may issue injunctions or other orders which are necessary to protect the interests of the parties or to effectuate the purposes of this part and may grant such other relief or remedy as equity and justice require against either party. . . .

23 Pa.C.S.A. § 3323(f). "He who comes into a court of equity must come with clean hands." *Shenango Valley Osteopathic Hosp. v. Dep't of Health*, 499 Pa. 39, 451 A.2d 434, 440 (1982); *see also In re Adoption of S.A.J.*, 575 Pa. 624, 838 A.2d 616, 625 (2003). "The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy at issue." *Id.* (citation omitted).

¶ 21 "The purpose of the PFA Act[8] is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Mescanti v. Mescanti*, 956 A.2d 1017, 1022

---

6. Wife also alleges the court erred in considering whether the parties were attempting to reconcile as a factor in whether there was an equitable defense to his receiving rental credit. The trial court made one brief reference to the question of whether the parties attempted reconciliation:

 As for Wife's assertion that the credits are not owed after August of 2005[ ] because of Husband's exclusion from the marital home via a PFA Order, we find no merit to this argument; the parties were already separated and Husband was already gone from the marital home, **and there were no talks to reconcile which were 'undone' as a result of the PFA.**

 (Trial Ct. Op., at 9) (emphasis added). Without more discussion, we are unable to review the extent to which the issue of reconciliation affected the trial court's conclusion. Never-

theless, because of our disposition of relevant claims raised by Wife, this omission does not affect our analysis.

7. While there are equitable distribution cases that involve a PFA order, none directly address the issue before us. *See Teodorski v. Teodorski*, 857 A.2d 194, 199 (Pa.Super.2004) (finding PFA order filed against spouse evidenced intent to dissolve marital union, and thus was properly fixed as date of separation); *In re Estate of Cochran*, 738 A.2d 1029, 1030 (Pa.Super.1999) (finding husband's abusive conduct and resultant removal from marital home under PFA established "willful and malicious desertion" and thus grounds for forfeiture of spousal share of wife's estate under 20 Pa.C.S.A. § 2106(a)).

8. 23 Pa.C.S. §§ 6101–6122.

(Pa.Super.2008) (citation omitted). Here, the PFA entered in the Lebanon County Court of Common Pleas against Husband specifically provided:

> [Husband] is completely evicted and excluded from the residence at:
>> [Address of marital residence]
>> or any other residence where [Wife] or any other person protected under this Order may live. Exclusive possession of the residence is granted to [Wife]. [Husband] shall have no right or privilege to enter or be present on the premises of [Wife] or any other person protected under this Order.

(PFA Order, 8/19/05, at 2).

¶ 22 The trial court here found the PFA irrelevant to the issue of rental credit because the parties were already separated and Husband had left the marital home by the time the order was issued in August of 2005. (Trial Ct. Op., at 9). We disagree.

¶ 23 In this instance, it is clear that Husband's behavior prompted the PFA, which in turn excluded him from the home.[9] No matter the reason for Husband's not living in the marital residence after January 8, 2005, there is no dispute that as of August 18th, he was precluded from even visiting the home. We therefore conclude that equity prohibits Husband from receiving a monetary credit from Wife for the time that he was excluded by the PFA, as the order was entered on the basis of his misbehavior toward her. Thus, we agree with Wife that Husband was not entitled to any rental credit after the PFA was issued against him.

¶ 24 In light of our remand for the court to reexamine the parties' contributions to the purchase and improvement of the marital home, we also remand for the court to consider the amount of rental credit for the period from the parties' separation through the initiation of the PFA. As stated above, "rental credit is based upon, and therefore limited by, the extent of the dispossessed party's interest in the property." See Trembach, supra at 37. Because the court will enter new findings as to Husband's interest in the marital home, the amount of rental credit due to him will be affected. Accordingly, we vacate the portion of the trial court's order pertaining to the rental credit and direct the court to exclude from rental credit any time that the PFA was in effect, and to recalculate the remaining amount of credit.

■ ¶ 25 Finally, Wife avers that if Husband's rental credit is affirmed, it should be reduced by one half of the amount she has expended: (1) to maintain the home; (2) on homeowners' insurance; and (3) on utilities.[10] She concedes that the trial court deducted Husband's obligation for the real estate taxes paid by her.[11]

9. Husband argues that this Court should disregard Wife's references to the events that occurred on July 19, 2005 because the transcript from the PFA hearing was not included in the certified record in this appeal. (Husband's Brief, at 21). However, we find that it is not necessary for this Court to review the chain of events or specific acts; what is relevant to our discussion is only that Husband perpetrated some hostile act toward Wife, and that the Lebanon County Court of Common Pleas found the incident sufficiently grave to justify excluding him from the marital home and to enter a PFA order against him.

10. Wife avers in her brief that she spent: (1) on maintenance, "at least $2,680 per year" for two years, arriving at this amount by calculating one percent of the value of the home; (2) on homeowners' insurance, a total of $2,097.75 for the twenty-five month period; and (3) for utilities, $419.42 monthly. (Wife's Brief, at 21–22).

11. Because neither of the parties has raised the issue of whether a spouse who is denied rental credit because of a PFA exclusion from the marital home should nevertheless be re-

¶ 26 This Court has "upheld deductions from rental value awards for the non-possessing spouse's share of expenses related to preserving the marital residence (*i.e.,* mortgage, insurance, taxes, maintenance)." *Gaydos v. Gaydos,* 693 A.2d 1368, 1377 (Pa.Super.1997) (citation omitted). In considering this type of claim, this Court has held that the grant or denial of such reductions was "within the sound discretion of the trial court." *Id.* (citing *Powell v. Powell,* 395 Pa.Super. 345, 577 A.2d 576, 584 (1990); *Trembach, supra* at 37).

¶ 27 Here, Wife cites to the transcript for her testimony that she expended about 1% of the value of the home annually for maintenance, such as roof and carpet repairs and the cost of utilities. However, there is no authority that **requires** a court to deduct such expenses from the dispossessed spouse's rental credit. Instead, caselaw has consistently indicated that the amount of rental credit awarded is within the trial court's discretion. Here, the court granted a deduction for the real estate taxes paid by Wife, but not other expenses. In doing so, the court acted within its discretion. Accordingly, we reject Wife's claim.

¶ 28 In her third issue, Wife challenges the portion of the court's order directing her to pay Husband $130,032.06, representing the net credits due to him after calculating the 65/35 distribution scheme. The order provided,

> **In the event that Wife is unable to pay the aforementioned sum,** Wife is directed to immediately list the marital home for sale and Husband is entitled to the first $130,032.06 of proceeds.

(Order, 10/18/07, at ¶ 7) (emphasis in original). Wife argues the court erred in ignoring her request to satisfy the distribution order by transferring retirement

monies to Husband by way of a tax free rollover. Wife reasons that although the order "intimates" that she could encumber the home to secure the payment, the reality is that "it is impossible" for her to obtain a $130,000 mortgage. (Wife's Brief, at 30). Wife refutes Husband's argument that should he be forced to receive a rollover of retirement funds, any immediate withdrawal of those funds would incur tax and penalties. Wife reasons that Husband has already accessed retirement funds during their separation, and at 56, "he need only wait until he is 59½ in order to access his retirement monies without penalty." (*Id.* at 31). Wife maintains that the parties' child has resided in the marital home since his birth, and that displacement from the home would cause him harm.

¶ 29 In support of her claim, Wife cites *Moran v. Moran,* 839 A.2d 1091 (Pa.Super.2003), and *Zollars v. Zollars,* 397 Pa.Super. 204, 579 A.2d 1328 (1990), *appeal denied,* 527 Pa. 603, 589 A.2d 693 (1991). We reject Wife's reliance on those cases for the proposition that "case law is clear that courts should be reluctant to require the sale of the marital home." (*See* Mother's Brief, at 31). In *Moran,* this Court found the trial court abused its discretion in not **explaining** why it rejected the master's recommendation that the husband be allowed to refinance a vacation property and thus retain it. *Id.* at 1096. Accordingly, this Court remanded for the trial court merely to set forth its reasons on that issue. *Id.* at 1098. The Court did not, as Wife advocates, hold that the decision to require the husband to sell the property was in itself erroneous, nor did it refer to any other authority that addressed this issue.

sponsible for any real estate taxes or other maintenance costs, we do not address it here.

¶ 30 In *Zollars, supra,* the trial court awarded the wife 65% of the marital estate, but she did not have the funds to pay the husband his share of the equity in the marital home. *Id.* at 1331. "The trial court attempted to deal with this dilemma without forcing the sale of [the] home by computing a formula which would reduce" the wife's share of the husband's pension by his share in the home. *Id.* On appeal, this Court found erroneous the **formula** by which the trial court computed the various dollar amounts, and made no judgment that the distribution scheme as a whole was improper. *See id.* at 1332. Thus, neither *Moran* nor *Zollars* provides guidance as to whether a court should compel a party to sell a marital home.

¶ 31 Nevertheless, because we remand for the court to review and enter new findings on the contribution of the parties to the value of the marital home, the overall distribution of the marital estate will be affected. Accordingly, we need not address the merits of this claim.

¶ 32 Decree affirmed in part and reversed in part, and case remanded to the trial court for: (1) recalculation of rental credit to Husband, excluding any time in which the PFA excluding him from the marital home was in effect and recalculating the remaining amount; and (2) review of the parties' contributions to and distribution of the value of the marital home. Jurisdiction relinquished.[12]

¶ 33 GANTMAN, J. files a Concurring Statement.

## CONCURRING STATEMENT BY GANTMAN, J.:

¶ 1 I agree with the majority's decision to reduce the fair rental credit due Husband in light of the protection from abuse order. Regarding the equitable distribution award, however, I write separately to emphasize that Wife used significant premarital funds to purchase a home, refinance it, and improve it. She also used her funds from the sale of pre-marital assets to pay off marital debt. Husband enjoyed the benefit of living in the home during the parties' short marriage, but by his own admission, he contributed nothing to the marital estate. Meanwhile, Husband keeps his entire retirement fund, valued at approximately $500,000.00, which was not subject to equitable distribution because it was Husband's pre-marital asset.

¶ 2 The court determined the value of the home was $286,500.00. In light of the gross disparity in the parties' individual contribution to the marital estate and in the remaining non-marital assets of each party, as well as the fact that Wife has primary physical custody of the parties' minor child, I think Wife should receive 100% of the residence. Under the circumstances of this case, I am convinced of the obvious injustice to Wife in forcing a sale of the home where she and child live. In sum, if Husband gets to keep his pension, Wife should get to keep the home. What marital assets are left can then be divided according to an equitable percentage.

---

12. Wife's reply brief raises the contention that the form of Husband's brief contravenes the Pennsylvania Rules of Appellate Procedure. We note that Wife's brief includes similar violations. (*See* Wife's Brief, at 6, 8) (factual and procedural history containing argumentative statements). Nevertheless, because our resolution of this appeal is based on a review of the substantive claims raised in Wife's brief, the trial court's opinion, the record, and applicable law, any violations by either party do not affect our disposition.